# THE ARCADE COMPANY *v.* BOXWELL.

---

EVIDENCE; EXPERT TESTIMONY; FALSE IMPRISONMENT; DIRECTION OF VERDICT.

1. Testimony as to conditions of temperature and moisture in the corridor of a cold storage plant, though based on observations of the witness a year after the plaintiff's alleged imprisonment therein, is admissible in evidence, where the plaintiff has testified as to such conditions,

and there is evidence that the conditions had not changed in the meantime.

2. A medical expert should be permitted to give his opinion as to the nature of plaintiff's illness based on the plaintiff's statement of his symptoms and the witness' physical examination.

3. A verdict should be directed for the defendant in an action for wrongful imprisonment and exposure in a cold storage room, instituted by the former tenant of a market stall, who, having forfeited his right to occupy the stall and the compartment of a storage room for non-payment of rent, and having been tendered the right to remove his goods, was locked by the defendant in the cold storage room, in which the plaintiff had gone for the purpose of breaking the lock of the compartment therein containing his meat, and detained in the storage room pending the arrival of an officer, and following a threat which he had made to do violence with a meat cleaver if not permitted to obtain his meat for the purpose of placing it in the stall for sale; the conduct of the defendant being reasonable under all the circumstances.

No. 2564.   Submitted November 6, 1913.   Decided December 1, 1913.

HEARING on an appeal by the defendants from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for injuries resulting from plaintiff's imprisonment by defendants in a cold storage room.

*Reversed.*

The COURT in the opinion stated the facts as follows:

Samuel L. Boxwell brought this action against the Arcade Company, a corporation, and Frank L. Averill, its manager, appellants, to recover damages for wrongfully and maliciously locking plaintiff in a cold storage room with intent to injure him, thereby causing him bodily pain, mental anguish, and illness which permanently impaired his health and caused the expenditure of much money, etc.

Besides the general issue, defendants pleaded specially that the plaintiff threatened with force and arms to assault said Averill and other employees of the Arcade Company, and to injure its property, and that, to prevent such injuries, they were forced to detain the plaintiff for a small space of time

within the entrance to the cold storage room by closing the door thereto, doing no unnecessary damage thereby, etc.

Plaintiff testified that he is sixty-two years old, and has been a butcher since boyhood. Took two stalls in the Arcade Market about Thanksgiving, 1910; two stalls, No 107 and No. 117, for $30 per month. Afterwards transferred to a single stall, No. 86, at $15 per month, about April 1st, 1911. Produced receipts showing $30 rent paid April 3, 1911, for stalls 107 and 117; $10 part payment of rent on stall 86 for April; and $5 paid May 2 for balance of rent of 86 for April. The cold storage department was opened May 1, and plaintiff took a compartment therein, for which he paid the rent of $9 for May. Paid no rent on stand 86 for May; no one came to collect or made any demand until June 1. Afternoon of May 31 about 5:30, he closed his stall and put his meat in the cold storage compartment, and locked it up. Returned to the market about 6 A. M. June 1. Sent a man for his meat, who reported he could not get it as there was another lock on the door. Waited until Manager Averill came, who, in response to plaintiff's inquiry why he was locked out, said that he had not paid his rent. Told Averill his rent was paid to June 4, who replied that the lock would not come off until the rent was paid. Told Averill he would break the lock and get his meat out; got his cleaver and started into the cold storage department. He had sold meat the day before and wanted to deliver it. When he started with his cleaver Averill called to him to wait a minute, but he went on, cleaver in hand, to break the lock. Was followed by Averill and the market master, who shoved the door to after he had entered, and fastened it on the outside. Was in there about half an hour and was let out upon the arrival of a policeman who had been sent for by Averill. Was sick when he came out and sat down for quite awhile fanning himself. Cold sweat came out on him. He had on no coat or hat and had on light underclothing. The compartment was air-tight and damp; two large pipes without covering ran across above. Went home, and about five days later got a pain in his back, and went about eight times to a doctor, who not doing him much

good, he changed to Dr. Smith. Went to bed then for over two weeks, and was confined to the house for five or six weeks. Did no more work until September, when he began work for Mr. Butler in K Street Market. Had to give this up because unable to stoop on account of pain in the back. Worked as night clerk at Merchants Hotel for about nine months. Had to quit the job because pains in the back prevented his walking up and down stairs. Has not been employed since. Prior to confinement, had not taken a dose of medicine and had never suffered from rheumatism. Cross-examined, he said that he went to see the first doctor five days after the cold storage experience. Under the lease of the two stalls he was required to pay rent on the last day of the month for the coming month. Missed two months paying on time with consent of Averill, who allowed him to pay later. Was then paying $30 per month for two stalls. Only signed one lease, and when he changed to the single stall was not notified to send his lease up to have it modified. Did not come to him in May for rent. Was going to pay June 1, and had the money in his pocket, but did not offer to pay when told it was unpaid, because his meat was locked up. When Averill told him his rent was unpaid and that the lock would remain until it was, he said he would break the lock. Did not say: "Nobody here will interfere with me. If they do, I will give them my cleaver." When he told Averill he would break the lock, he was not "so angry that he was going to hurt anybody without they hurt him." Did not have the cleaver when talking to Averill, but went back and took it off the hook; when called to wait a minute, paid no attention, but went right on. Was his intention to break the lock, but he did not go into the freezing room because when he entered the first hall from which the door opened into the freezing compartment, they closed the outside door, locking him in so that he could not have carried his meat out. It was "cool a plenty" in the place where he was confined. The pipes were uninsulated, and covered with ice; were right over him.

The first physician who attended plaintiff was not called. Dr. Smith said plaintiff gave him a history of the exposure to

intense cold, which he judged to be the exciting cause of the complaint, which he diagnosed "as acute rheumatis myositis, or acute inflammatory condition of the muscles of the back, the lumbar muscles." That a change from the temperature to 40 or 45 degrees would be sufficient to be regarded as an exciting cause of myositis. The time between exposure and attack might vary in different persons, depending upon the condition of their health. The system frequently shows the effects of exposure to cold within a few hours, and it usually occurs within a day or two; though sometimes it might be two or three days, no definite time.

The owner of the house where plaintiff had a room testified that he first complained of being ill a week or ten days after leaving the market.

Butler testified that plaintiff began working for him in fall of 1911. He complained of dizziness and pain in back. Quit in February or March, 1912. Was a hearty eater and said nothing about being on a diet. Nephew and brother of plaintiff testified to his excellent health prior to June, 1911; to his good appetite always, and to his growing very stout.

Defendants introduced a floor plan of the Arcade Market, which shows a cold storage department in northwest corner. It has a corridor opening from the outside. From this, doors open into the various cold storage compartments, in one of which was plaintiff's meat. The entrance to the corridor is usually kept open. In this corridor plaintiff was confined.

Averill testified that he was manager of defendant market company. He produced a lease to plaintiff of two stands, dated November 14, 1910. The lease was executed by both plaintiff and defendant, and was introduced in evidence. The relevant clauses are that lessee promises to pay $30 per month for two stalls, subsequent payments to be made on or before the last secular day of each and every month as rent in advance for the next succeeding month during the term of this lease; lessee will conform to all laws and police regulations and the regulations of the lessor, which are made part of the lease; if the lessee shall fail to pay in advance, on the last secular day of each month,

the rent for the next month, the term and all rights created by the lease shall cease at the option of the lessor, without any demand for the payment of rent or any notice to quit, both of which are waived, and the lessor may, without notice or legal process, enter upon the leased space and take possession of the stand and fixtures, and remove therefrom all movable goods and property belonging to the lessee. The regulations, among other things, provide that no person will be allowed to occupy a stand, stall, or privilege before he shall have executed a lease, made all required payments, and been placed in possession by the superintendent.

Witness further testified that about April 1, plaintiff desired to change his stand on account of inability to pay $30 per month, and an arrangement was made to modify his lease accordingly. He transferred to the single stand at $15 per month, the same being half the size of the former. Did not send in his lease to be modified as requested. Was difficult to get him to pay his bills. Witness called many times for back rent. Early in May he made a payment for back rent. Claimed he could not pay his rent, and witness, having been told that he had failed to pay on May 31, told the market master, at the closing hour that day, not to allow plaintiff to do any further business in the market. As he entered the market the next morning, plaintiff asked him why they were stopping him from carrying on his business. Witness replied that he knew perfectly well, having been warned repeatedly; that they had had so much trouble with him they would do business with him no longer, and he would have to give up his stand. Plaintiff said he did not propose to give up his stand, but was going to do business there. He became very much excited, went to his stand, picked up his cleaver, came back saying he would show that he was going to put his stuff on the stand and run it. Witness asked the market master, who was also a special policeman, to stop him, but, being apparently afraid, he kept out of plaintiff's way, as he was mad and had his cleaver in his hand. Plaintiff kept on and entered the corridor leading to the refrigerating room. When he entered the door was closed on

him. Witness immediately called the police department and asked that an officer be sent immediately. In about fifteen minutes the officer came.

On June 1, only two rooms, the meat and fish rooms, were under refrigeration. That plaintiff's compartment had been given him as near as possible, because he had said that he was troubled with rheumatism and did not want to walk farther than could be helped. Each cold room adjoining the corridor was insulated with 3 to 5 inches of cork. The pipes along the top of the corridor were covered with 2 inches of insulation, and do not feel cold to the hand. The corridor floor is dry and clean. Lights are controlled by switches in the corridor. There has been no change whatever in the department since. The light comes in as shown in photograph exhibited to the jury. One could see everything in the corridor with the lights turned off. Outside door of corridor does not fit closely where the track comes through. The corridor door is never closed save at night, to exclude people. Never any ice on the pipes because absolutely insulated. Not much difference in temperature of corridor from that outside. Cross-examined, he said plaintiff had told him he wanted to get his meat; told him he could not have it to put on his stand. Had testified in police court that he had asked plaintiff to protect defendant's property. He wanted plaintiff to go out of the market; would have been willing for him to take his meat and get out, but he refused that, and insisted on putting it on the stand. Did not offer to get his meat for him. Gave him a wide berth, but did not want him to smash the property. Tried to get the special officer to arrest plaintiff, but he would not. Door was closed on him as a matter of protection, and witness thought he must get a regular officer quickly. Plaintiff had not interfered with witness, but he was afraid he might. Had not threatened witness personally, but had stated he was going to break open the meat box and put his meat on the stand; witness did not want him to do that. The regulations of the company controlled plaintiff's occupation of the premises. Had agreed to let plaintiff have stand 86 at $15 per month payable on the last day of the pre-

ceding month; to the best of his recollection plaintiff had never made a payment on time.

Defendant offered Dr. Reichelderfer as a witness. He had graduated in medicine in 1899, and had been superintendent of Garfield Hospital seven years, after two years as interne, and was now on the hospital staff, though engaged in private practice. Had inspected the corridor last fall.

He was offered to prove the condition of the same in respect of conditions of temperature and moisture. In connection therewith defendant offered to prove that there had been no changes in the conditions since June 1, 1911. The court excluded the evidence as too remote; that it would put on the jury the determination of a collateral matter, whether the condition was the same at both times. Defendants excepted. He was also asked that, taking into consideration what plaintiff had told him of his symptoms, and his own examination, had he found what trouble those symptoms would indicate. The question was not permitted to be answered, and defendants again excepted.

The testimony of witness then tended to show that myositis was so rare a disease he had never seen a case; that the disease of muscular rheumatism comes usually within a few hours of exposure to cold draught, or after becoming wet in cold weather, etc. Dr. Wade Atkinson, president of defendant corporation since spring of 1911, testified that he had been familiar with the conditions in the corridor from the beginning; there had been no changes. Refrigerating pipes had never been exposed in the corridor; had been covered from the beginning. Impossible for the floor to be wet. Practically no difference between the temperature inside the corridor and outside, the walls' and the pipes being insulated. In summer it was not a cold place, but a cool, shady place.

Another witness testified that he had been in defendant's employ from March, 1911 to 1912, as engineer. Had been no changes in the cold storage department while he was there. · It was his duty to take the temperature, and he went, or sent someone, to do so every two hours. There was not a difference

of more than five to seven degrees between the temperature of the corridor and that outside. It made little difference in the temperature of the corridor whether the door were open or closed; might have been a difference of a degree or two if the door were closed forty-eight hours.

Walls along the corridor and the pipes in it are heavily insulated. When the door is closed it is not so dark but that one can see to get around. The corridor was not uncomfortable in summer; used to sit in it sometimes on Sundays; another man and witness stayed in it three or four hours one Sunday. Temperature in the meat room is kept at from 34 to 36 degrees. He was in his apartment on morning of June 1; heard plaintiff and the market master quarreling about 6 A. M. About 9 o'clock he saw plaintiff hurry towards the cold storage with a cleaver in his hand, Averill and the market master following him. Saw them close the corridor door. In fifteen or twenty minutes a policeman came and plaintiff was let out. Still had cleaver in his hand and was mad; after talking with policeman he went out. Did not appear to be sick and did not sit down.

The bookkeeper testified that plaintiff was in default for May rent of stall, and for June rent, due May 31.

Charles K. Heath, who conducts the Merchants Hotel, testified that he had employed plaintiff as night clerk from May 15, 1912, to February 15, 1913. Did not give up the job because pains in his back would prevent his going up and down stairs. Was discharged because he would not obey orders and was getting too familiar with guests. Had an attack of rheumatism in his leg some time before discharge, and a doctor visited him a couple of times. Had never heard him complain of rheumatism before that time.

Levi Fritchman testified that he was market master in 1911, and had a commission as a special policeman for the market and Arcade building. That Averill, on the evening of May 31st, told him Boxwell did not pay his rent and he should lock his meat stall up, his meat room; that he carried out his instructions, and when Boxwell came in the next morning, on going out to the cold storage and finding it locked, he came

back and started on him and said he wanted his meat; that the witness told him about his rent, and Boxwell replied he would cut anybody with his meat chopper if they interfered with him getting his meat on his stand; that the witness told him he was obeying orders, and explained to him what he had done and why; that nothing further was done until Averill came, about 9 o'clock, soon after which he saw Averill and Boxwell talking. That he heard Averill tell him he should pay his rent, and he said he was going to get his meat; that Averill talked nice to him; that Boxwell was in a mad rage, and said he would cut anybody who would interfere with him getting his meat out on the stand. That he ran and got his meat chopper and went out to the cold storage, and Averill told him he should arrest him, but the witness would not take hold of the man in the mad rage he was in with a meat chopper in his hand; that the witness followed him, and when he went into the cold storage room the door was closed, and a policeman was then telephoned for in case he was in the mad rage when he came out; that the policeman came in about fifteen minutes, and on his instructions the witness opened the door and let Boxwell out. He was in a milder temper then, and after the policeman talked with him he went peaceably away from the building. That he did not ask the policeman to arrest him after he let him out, because he did not see that it was worth while; that he was only in a mad rage, and that he made no effort to occupy his stand after that.

Witness further testified that he usually went into the corridor of the cold storage department twenty-four times a day. Temperature in the corridor was about 55 degrees. Would sometimes go in there on a hot day because it was a little cooler than on the outside. Plaintiff's threats were made against anyone who would interfere with his getting his meat. He showed he was not willing to leave his stand peaceably; said he would not go out, and if anybody interfered he would cut him with his meat chopper.

Cross-examined, witness said plaintiff's meat had been locked up by direction of Averill. He had put on an extra lock.

Plaintiff waited at his request for Averill's coming. Heard them talking. Averill said he should pay his rent; could have his meat if he took it out of the market. He talked nicely to plaintiff, who said he was going to have his meat. Averill did not offer to open the box. Plaintiff said he was going to break the lock with his cleaver.

Plaintiff produced no evidence in rebuttal. Defendants moved the direction of a verdict upon all of the evidence. This was denied and exception taken.

The first instruction given on behalf of plaintiff related to compensatory damages, stating, as elements of damage, physical injuries, mental suffering, sense of shame or humiliation, and expenses incurred in treatment of injuries.

The second instruction for plaintiff charged the jury that if they find plaintiff is entitled to recover, and further find that the defendants acted wantonly, recklessly, and maliciously, and with a total disregard of plaintiff's legal rights, then they may award him, in addition to compensatory damages, such an additional sum as will act as a penalty for such acts and a warning to the defendants against perpetrating any act of a similar character in the future. Exceptions were noted to both instructions. After the denial of the instruction to return a verdict for them, defendants requested several instructions, which were granted. The general charge, which did not repeat the instructions on the measure of damages, was not excepted to.

*Mr. Joseph W. Cox, Mr. J. T. Sherier, Messrs. Leckie, Cox, & Kratz,* and *Mr. David Rothschild* for the appellants.

*Mr. Samuel V. Gusack* and *Mr. John C. Gittings* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. We are of opinion that the court erred in excluding the evidence of Dr. Reichelderfer relating to the conditions of tem-

perature and moisture in the corridor when he inspected the same. There had been evidence on the part of defendants that there had been no changes, whatever, in the construction of the compartment or the pipes therein since the original construction; and they offered to present evidence, which they subsequently did, of additional witnesses, to the maintenance of the same conditions continuously thereafter.

Plaintiff had testified to conditions of moisture, darkness, and excessive cold in the corridor in which he had been confined for fifteen or twenty minutes; and the issue was a material one.

Other witnesses to those conditions were employees of the defendant corporation, and, while the evidence of this witness was cumulative, it was of materiality for that reason if none other. Assuming that, because the witness's inspection had occurred more than a year after June 1, 1911, it was entitled to but little weight, nevertheless that weight was for the determination of the jury.

2. It was also error to exclude the opinion of the same witness, who qualified as a medical expert, as to the nature of plaintiff's illness based upon plaintiff's statement of his symptoms and the witness' examination of him.

3. The next error assigned is on the exception taken to the refusal of the court to direct a verdict for defendants.

The grounds upon which this direction was asked are, in substance, that the undisputed testimony shows that plaintiff's lease of the market stall had been legally terminated, and that he had no longer a right to occupy it; and that plaintiff's imprisonment was reasonable under the circumstances for the protection of person and property.

We are of the opinion that the instruction should have been given.

The change of stalls and consequent reduction of the monthly rent had not affected the other covenants of the lease. Having failed to pay his rent, as covenanted, on May 31, the defendant market company exercised its option to terminate the lease in strict pursuance of the covenant.

On June 1 plaintiff had no legal right to occupy or do business

at the stall. His only legal right was to the possession of his meat for removal from the building. He was offered possession of it for that purpose. This he refused to do, and declared his intention to bring the meat to the stall and carry on his business there. Seizing his cleaver he started to the corridor entrance with the avowed intention to break the lock, remove his meat to the stall, and carry on business there, notwithstanding the termination of his lease.

Assuming that he had the legal right to the possession of his meat, he had no right to repossess himself of it by an act of violence; much less to reoccupy his former stall. That he was angry there is no doubt. He said in giving his own testimony that he was not "so angry that he was going to hurt anybody without they hurt him." In other words, he intended to use unlawful violence in breaking the lock and taking his meat to the stall, and to hurt anyone who interfered. Defendant Averill wanted the special officer in defendant's service to apprehend or stop plaintiff, but that officer, apprehending personal injury, declined the job. Plaintiff says that when he "took up his cleaver and started, Averill called to him to wait a moment, but he did not stop or turn around, but went on to the cold storage with his cleaver in his hand to break the lock off, and was followed by Averill and the market master, who shoved the door to and fastened it on the outside after he entered the corridor." Defendants had the right to protect their property. Plaintiff was between them and the corridor entrance, so that they could not close the door in it. They apprehended, and apparently had good cause to apprehend, violence if they should use force upon him. Instead of attempting force, they closed the corridor after he entered it, and immediately telephoned for a regular police officer. Plaintiff made no complaint of the cold, did not offer to desist, or ask release. As soon as the police officer came, he was released and was persuaded by the officer to leave the premises.

Was the conduct of the defendants reasonable under all the circumstances related?

In view of plaintiff's anger and possession of a deadly weap-

on, and his own statement of his conduct and intentions, we are of opinion that defendants' conduct in closing the door was reasonable. Instead of using force and running the risk of personal injury to plaintiff or themselves, they closed the door upon him and effectually prevented it.

A peaceable person desiring to protect his person as well as his property could not reasonably be expected to do less.

Upon the evidence the court should have directed a verdict for the defendants.

After what has been said, it is unnecessary to discuss the error assigned in the instruction relating to exemplary damages.

The judgment is reversed, with costs, and the cause remanded for a new trial.                              *Reversed.*