**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2151
_____

UNITED STATES OF AMERICA

v.

KENNETH SMUKLER,
                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-17-cr-00563-002)
District Judge: Honorable Jan E. DuBois
_____

Argued June 17, 2020

Before: JORDAN, MATEY, ROTH, *Circuit Judges*.

(Filed: March 19, 2021)

Eric L. Gibson, Esq. (Argued)
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*

Peter Goldberger, Esq. (Argued)
50 Rittenhouse Place
Ardmore, PA 19003
        *Counsel for Appellant*

_____

OPINION

_____

MATEY, *Circuit Judge*.

Interpreting the term "willfully" can be a challenge. It is a "chameleon word," *United States v. Starnes*, 583 F.3d 196, 210 (3d Cir. 2009), and "[i]n any closely reasoned problem, whether legal or nonlegal, chameleon hued words are a peril both to clear thought and to lucid expression," Bryan A. Garner, A Dictionary of Modern Legal Usage 145 (2d ed. 1995) (quoting Wesley N. Hohfeld, Fundamental Legal Conceptions 35 (1919) (reprint 1966)). But we take comfort knowing that we do not struggle alone with this "notoriously malleable" concept. *Bryan v. United States*, 524 U.S. 184, 202 (1998) (Scalia, J., dissenting). Indeed, "willfully" is "a word of many meanings" whose definition is "dependent on the context in which it appears." *Id.* at 191 (majority opinion). And just as a chameleon's appearance depends on the surroundings, we look to the whole text of a law to best "interpret the words

2

consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (alteration in original) (internal quotation marks omitted). We approach that task with a full box of "traditional tools" of construction. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Aided by these principles, interpreting "willfully" seems less troublesome.

Kenneth Smukler asks us to do just the opposite, arguing for an exceptional understanding of "willfully" in otherwise unexceptional statutes. But the ordinary understanding of "willfully" is the best one. Smukler does, however, rightly point out that the District Court departed from our prior decisions when instructing the jury on two of his nine counts of conviction. So we will vacate his conviction on those counts. Smukler also brings a host of other procedural and substantive challenges from his trial. Finding none with merit, we will affirm his other convictions.

## I. BACKGROUND

Kenneth Smukler made a thirty-year career in the rough and tumble world of campaign politics. From mayors and city councils, to members of Congress and presidents, Smukler steered campaigns across Pennsylvania. And as an attorney, Smukler developed familiar expertise with Federal Election Commission ("FEC") law. Then, as it sometimes does in politics, things went wrong.

## A. The 2012 Democratic Primary for the First Congressional District of Pennsylvania

In 2012, United States Representative Bob Brady ran for reelection to represent Pennsylvania's First Congressional

3

District in Philadelphia. Jimmie Moore, a former Philadelphia Municipal Court Judge, challenged Brady in the Democratic primary. Moore struggled to raise money, so he personally loaned his campaign about $150,000. It was not enough, and Moore soon concluded that he would not win. He turned to Plan B, reaching out to former Philadelphia Mayor Wilson Goode to arrange a meeting between himself and Brady, with Goode providing the "glue." (App. at 971, 1555.)

In a scheme lacking only a smoke-filled backroom, Moore, Goode, and Brady hashed out a deal for Moore to drop out of the race. In exchange, Brady agreed to give Moore $90,000 to pay off campaign debts and reimburse some of Moore's campaign loan. Of course, as Moore, Goode, and Brady all knew, one candidate cannot bribe another candidate to drop out of an election. They needed a plan to steer the money to Moore. Brady suggested that he buy a poll that Moore had conducted. The purpose was plain: "mov[e] money from Bob Brady's campaign to Jimmie Moore's campaign." (App. at 1318.) With an agreement in place, Moore dropped out of the race a few days later, clearing Brady's path to the Democratic nomination.

But the money still needed a mover, and Smukler emerged as the middleman. Once Moore formally dropped out, Smukler met with Moore "to make the arrangements" and "set up the process for [Moore] to get the money." (App. at 953, 1071.) Smukler proposed a three-part scheme. First, they would set up a bogus corporation to receive the funds from the Brady campaign. Then, Moore would create "some dummy invoices." (App. at 954, 1063.) Finally, Smukler would pay Moore in three installments, through cash sent to Moore's

4

campaign manager and romantic partner, Carolyn Cavaness.[1] For good measure, Smukler would route the payments to Cavaness through the consulting firm of Donald "D.A." Jones, a political consultant working for Brady, for work that Cavaness never performed.[2] All went as planned, including, of

[1] Smukler advised Cavaness that the Brady campaign would pay $65,000 in two installments for old polling data from the Moore campaign. According to Smukler's instructions, Moore and Cavaness set up a shell company, CavaSense and Associates, LLC, that would sell the old poll to Smukler. Through the shell company, Cavaness would contract with Voterlink Data Systems ("VDS"), a company operated by Smukler, so that VDS would pay $65,000 in two installments for the poll. On June 11, 2012, the Brady campaign paid VDS $40,000 for "Survey and Polling Services." Two days later, VDS paid CavaSense the first installment of $40,000 in a check signed by Smukler. On July 10, 2012, the Brady campaign wrote another check to VDS in the amount of $25,000. One week later, on July 17, 2012, VDS wrote CavaSense a second check, also signed by Smukler, for $25,000. Both checks arrived in Cavaness' personal bank account shortly after receipt.

[2] Under Smukler's plan, the Brady campaign would pay Jones $25,000 and, in turn, Jones would pay Cavaness $25,000. A plan Jones was comfortable with "[a]s long as it wasn't [his] money." (App. at 1320.) On June 20, 2012, Cavaness sent Jones an email with invoices from CavaSense, totaling $25,000. Jones waited until he received the money from Brady's campaign before paying Cavaness. Then the Brady campaign cut a check to Jones in the amount of $25,000 for "Political Consulting." Around seven days later, Jones sent a

course, both campaigns omitting accurate reporting of any of these transactions to the FEC.

**B.     The 2014 Democratic Primary for the Thirteenth Congressional District of Pennsylvania**

In 2014, former United States Representative Marjorie Margolies launched a comeback bid. Like many elections, congressional contests occur in two cycles: a primary election, where candidates of the same political party square off, followed by a general election between the prevailing candidates of each party to decide who will represent the people. Federal election law limits contributions to a candidate in both phases. So while candidates may collect primary and general election funds at any time, they cannot use general election funds to pay for primary election expenses. That means if a candidate loses the primary, the campaign refunds any general election contributions to donors.

Margolies faced a crowded field of primary opponents and hired Smukler to run her campaign. But as the race dragged on, Margolies ran low on funds and Smukler dipped into the general election reserve. It wasn't enough; Smukler needed more money to cover crucial campaign expenses like media buys. So he leaned on friends and family to get cash quickly, using them as straw men to evade federal election laws and pass through money to the campaign. We detail several of those donations and associated misrepresentations.

---

check to CavaSense for $25,000. Cavaness did no work for Jones in exchange for the cash. In fact, when Cavaness sent the invoices, Jones had "never met her." (App. at 1328.)

### 1. Smukler Sends $78,750 to the Margolies Campaign

On April 29, 2014, Smukler emailed Jennifer May, Treasurer of the Margolies campaign, "I will be wiring $78,750 of the segregated media account funds into the campaign media account." (Supp. App. at 461.) No such "segregated media account" existed. A few days later, he wired $78,750 from his personal brokerage account to another of his companies, Black and Blue Media. From there, he wired the same amount from Black and Blue Media to a new Margolies campaign account to quickly pay vendors. Then Smukler asked his brother for $75,000, which his brother promptly sent to Smukler's brokerage.

### 2. The Campaign Spends Money Earmarked for the General Election and Smukler Steers Another $150,000 to Cover the Difference

Still short on cash, Smukler directed May to use general election funds on the primary. A deficit soon swelled, as the primary fund declined to a negative cash on hand of $126,761 and change. Then, Margolies lost the primary, leaving the campaign sixty days to refund all general election contributions. May suggested that Margolies pay the deficit herself, a lawful option that Smukler declined. Instead, he asked campaign officials, including May, to tell him "exactly what amount [Smukler's two companies:] InfoVoter and Black [and] Blue need to return to the campaign to reconcile all general fund contributions" as he "intend[ed] to transfer [the money]." (App. at 774.) Sensibly, May concluded that if Margolies did not write a check for the overage, "we are all in really big trouble." (App. at 2212.)

7

May was correct; Smukler was undeterred. He surprised May with the claim that the Margolies campaign "did not spend the general [election] money as it was escrowed in" Smukler's consulting company InfoVoter. (App. at 2212.) "[O]nce the money is refunded," Smukler explained, "all the general [election] checks will be issued within the [sixty-day] period." (App. at 2212.) That same day, an old friend of Smukler's, Kevin Morgan, wired $150,000 into Smukler's personal brokerage account. Two days later, Smukler wired $40,000 from his personal account to Black and Blue Media and $110,000 from his personal account to InfoVoter. It all wound up in the Margolies campaign in two separate transfers from Black and Blue Media and InfoVoter. Smukler directed both payments to appear as "[r]efund[s]" on the next FEC report. (App. at 610, 791–800; Supp. App. at 194.)[3]

### 3.     Smukler Conceals the Transfers

Smukler had another problem. Back in April, one of Margolies' opponents filed a complaint with the FEC alleging that the campaign had spent general election contributions on primary election expenses. That was true, so Smukler spun a false tale to the campaign's attorney, causing him to lie in the campaign's response to the FEC. Based on Smukler's representations, the campaign's attorney wrote to the FEC that

---

[3] As in 2012, Smukler used Jones as a "pass-through." (App. at 1356.) He asked Jones to write a check to the Margolies campaign, for which he would reimburse Jones for the contribution. Which Smukler did by sending Jones a check from InfoVoter in the amount of $2,600. Jones only made the payment with the guarantee that Smukler would pay him for it.

the Margolies campaign had "agreed to advance a portion of [general election] funds" to certain "campaign vendors in order to secure their services . . . for the general election." (App. at 2230.) But because "[t]he advanced funds would . . . pay for general election . . . expenses of the vendors," after Margolies lost the primary, the vendors "refunded the advanced payments to the committee." (App. at 2230.) Smukler's argument benefited from apparent support from the campaign's FEC filings, which had also described the payments from Smukler's companies as "refunds." (App. at 610, 791–800; Supp. App. at 194.) Based on the letter, the FEC dismissed the complaint.

### 4. *The Margolies Conduit Contribution*

The hasty movement of money between Smukler's companies and the campaign eventually caught the eye of the FEC. For one thing, Smukler's companies "refunded" the Margolies campaign $18,000 *more* than the campaign paid. But companies cannot send back more than they received without categorizing the payment as a corporate contribution. The campaign told the FEC that the discrepancy was a mere error and returned $18,000 back to InfoVoter. That caused more problems by putting the now-defunct campaign back into debt. Ever ready with a solution, Smukler told Margolies that although she was on the hook, he would cover the deficit and "write a check for [$]25,000" from Black and Blue Media "and that [she] would then write a check" back to the campaign. (App. at 1216, 1237–40.) She did so. The campaign classified it as a loan on the next FEC report.

## C. Tolling Agreements, Indictment, Trial, and Appeal

All of this consulting attracted the interest of law enforcement. With investigations mounting, Smukler and the

9

Government entered into two tolling agreements "regarding charges arising out of a payment from the Bob Brady for Congress campaign committee on or about August 23, 2012 to D. Jones & Associates in the amount of $25,000 and the subsequent use of that money by D. Jones & Associates."[4] (App. at 133, 133–39.) The first agreement extended the time for the Government to bring certain charges against Smukler from August 23, 2017 to September 26, 2017, while the second agreement extended the statute of limitations from September 26, 2017 to October 26, 2017.[5] A grand jury later returned a

---

[4] Both agreements advise Smukler that "the United States contends that this conduct may give rise to a number of violations of federal criminal law, including but not limited to Title 18, United States Code, Sections 2 (aiding and abetting), 371 (conspiracy), and 1001 (false statements), and Title 52, United States Code, Section 30109 (campaign finance violations)." (App. at 133, 137.) In both agreements, Smukler also acknowledges that he "understand[s] that by agreeing to toll, and thus not to assert, the claim of statute of limitations, [he is] giving up any rights [he] may have under the federal statute of limitations provisions regarding charges that may result from the investigation described in this document." (App. at 134, 138.)

[5] The tolling provision in the second agreement is more broadly worded: "I hereby agree to toll any applicable statute of limitations regarding charges arising out of a payment from the Bob Brady for Congress campaign committee on or about August 23, 2012 to D. Jones & Associates in the amount of $25,000 and the subsequent use of that money by D. Jones & Associates, *as well as any charges arising out of campaign finance reports filed by Bob Brady for Congress and Jimmie*

superseding indictment charging Smukler with eleven counts of various election law offenses related to both the 2012 and 2014 congressional elections.[6] Following trial, a jury returned

*Moore for Congress, from September 26, 2017 to October 26, 2017*." (App. at 137–38 (emphasis added).)

[6] The grand jury returned an original indictment on October 24, 2017, charging Smukler and then-co-defendant Jones with certain election law offenses relating to former Congressman Bob Brady's 2012 primary campaign. Jones later pleaded guilty and cooperated against Smukler. Along with charges related to Smukler's work on the 2012 Brady campaign, the March 20, 2018 superseding indictment charged Smukler with offenses related to the Margolies 2014 campaign.

Counts I through V of the superseding indictment related to the 2012 congressional primary campaign. Those counts charged Smukler with: conspiracy to commit campaign law violations and to make false statements, in violation of 18 U.S.C. § 371 (Count I); causing campaign contributions in excess of federal limits, in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i), 30116(f), and 18 U.S.C. § 2 (Count II); causing the Brady campaign committee to make false reports to the FEC, in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i), and 18 U.S.C. § 2 (Count III); causing the Moore campaign committee to make false reports to the FEC, in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i), and 18 U.S.C. § 2 (Count IV); and engaging in a scheme to falsify and conceal facts from the FEC, in violation of 18 U.S.C. §§ 2 and 1001(a)(1) (Count V).

Counts VI through XI related to Marjorie Margolies' 2014 congressional primary campaign. Those counts charged

a guilty verdict on nine of the eleven charges, acquitting Smukler on the remainder. He received a sentence of eighteen months' imprisonment, along with fines and assessments. Smukler now challenges on appeal a mix of procedural and substantive issues from his trial.

First, Smukler argues that the District Court incorrectly instructed the jury on the *mens rea* element of the federal criminal laws requiring the Government to prove that Smukler acted "willfully." The District Court explained that "the Government must prove beyond a reasonable doubt that defendant knew his conduct was unlawful and intended to do something that the law forbids." (App. at 1943.) "That is," the Court continued, "to find that the defendant acted willfully, you must find that the evidence proved beyond a reasonable doubt that defendant acted with a purpose to disobey or

_____

Smukler with: engaging in a scheme to falsify and conceal facts from the FEC, in violation of 18 U.S.C. §§ 2 and 1001(a)(1) (Count VI); making campaign contributions in excess of federal limits, in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i), 30116(f), and 18 U.S.C. § 2 (Count VII); making $2,000 or more in conduit contributions in the name of another, in violation of 52 U.S.C. § 30109(d)(1)(A)(ii), 30116(f), 30122, and 18 U.S.C. § 2 (Count VIII); making $10,000 or more in conduit contributions in the name of another, in violation of 52 U.S.C. § 30109(d)(1)(D), 30116(f), 30122, and 18 U.S.C. § 2 (Count IX); causing a campaign committee to make false reports to the FEC, in violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i), and 18 U.S.C. § 2 (Count X); and obstruction of justice, in violation of 18 U.S.C. §§ 2 and 1505 (Count XI).

disregard the law." (App. at 1943.) Smukler sought different language: that "the government must prove beyond a reasonable doubt that the defendant knew of the specific law prohibiting the conduct at issue, and that he acted with the intent to violate that specific law." (App. at 312.) In rejecting Smukler's proposed instruction, the District Court explained that it would follow "the mens rea standard of willfulness based on [the] Third Circuit Model Jury Instructions . . . and will not cover [Smukler's] inconsistent instructions requested on that issue." (App. at 12–13.) Smukler argues that because the Government charged him with violations in the federal election law context, our precedent required the District Court to charge the jury under a "heightened" standard of "willfully."

Second, Smukler claims the District Court erred when it denied his motion to dismiss Count II of the superseding indictment. Count II charged that Smukler "willfully caused contributions to the Jimmie Moore for Congress campaign in excess of the limits of the Election Act," based on the three payments totaling $90,000 made from the Brady campaign in exchange for Moore's withdrawal from the race. (App. at 109.) Those payments included (1) the June 11, 2012 payment of $40,000 routed through VDS; (2) the July 10, 2012 payment of $25,000, also sent through VDS; and (3) the August 23, 2012 payment of $25,000 steered through D. Jones & Associates. Smukler argued that the tolling agreement did not cover two of the three alleged payments, leaving those payments outside the statute of limitations. The District Court disagreed, and held that under *United States v. Dees*, 215 F.3d 378 (3d Cir. 2000), as applied to the Federal Election Campaign Act ("FECA"), "[t]he Government properly charged that [Smukler] and his co-conspirators caused payments aggregating at least $25,000 in a calendar year, between June 2012 and August 2012," (App.

13

at 25.), as "the offense . . . was completed on the date of the last payment and the statute of limitations began running at that time," (App. at 23.)

Third, Smukler challenges the sufficiency of the evidence to support his conviction on Count V. That count charged Smukler with causing the Brady and Moore campaigns to make false reports to the FEC, in violation of 18 U.S.C. §§ 1001(a)(1) and 2(b). On appeal, Smukler argues that the evidence could not prove that he "caused the Brady or Moore campaign to report or fail to report anything to the FEC." (Opening Br. at 36.)

Finally, Smukler contends that the District Court erred by failing to give specific unanimity charges as to Counts V and X. Each of those counts, Smukler claims, "charged two different acts," that "independently constituted a criminal offense under the statute(s) cited," thereby violating his right to a unanimous jury verdict. (Opening Br. at 40.)

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 because Smukler appeals from the final judgment of the District Court.

The parties dispute our standard of review for the District Court's "willfully" instruction. (*Compare* Opening Br. at 23, *with* Response Br. at 29.) Both cite authority that traces to *United States v. Zehrbach*, where we considered the basis for an objection to a jury instruction on a record "not entirely clear." 47 F.3d 1252, 1260 (3d Cir. 1995) (en banc). On the one hand, "if the objection is construed as a challenge to the court's statement of the legal standard, we exercise plenary

review." *Id.* On the other, if "the objection [is] read as a challenge merely to the confusing nature of the instruction," we will "review the trial court's expression for abuse of discretion." *Id.* at 1260, 1264. Smukler disputes only the legal standard behind the District Court's instruction. So "[w]e exercise plenary review over [Smukler's] challenges to the legal standards expressed in jury instructions." *United States v. Korey*, 472 F.3d 89, 93 (3d Cir. 2007) (citing *Zehrbach*, 47 F.3d at 1260).

Our review of Smukler's claim that the District Court erred in rejecting his motion to dismiss Count II is mixed. *United States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016). We "review the District Court's legal conclusions *de novo* and its factual determinations, including its findings about the contents and purposes of the acts alleged in the Indictment, for clear error." *Id.* As to Smukler's claim that the evidence could not support the jury's verdict on Count V for causing false statements to the FEC, our review is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). We "will overturn a verdict only 'if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'" *Id.* at 430–41 (quoting *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)).

Last, we review Smukler's claim that the District Court erred by not instructing the jury on specific unanimity as to Counts V and X for plain error because Smukler failed to object to this issue at trial. *United States v. Gonzalez*, 905 F.3d 165, 182 (3d Cir. 2018).

15

## III. Interpreting "Willfully"

Much of our task involves interpretation, a familiar pursuit because Congress does not always define each word in a statute. That does not invite invention. "After all, if judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). Instead, we employ the "fundamental canon of statutory construction" requiring that we "interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd.*, 138 S. Ct. at 2070, 2074 (alteration in original) (internal quotation marks omitted); *see also United States v. Johnman*, 948 F.3d 612, 617 (3d Cir. 2020). It is a focused inquiry and "[o]ur analysis begins and ends with the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014)). We rely on our "toolkit" containing "all the standard tools of interpretation" used to "carefully consider the text, structure, history, and purpose" of the statute. *Kisor*, 139 S. Ct. at 2414–15 (internal quotation marks and alteration omitted). That allows us to "'reach a conclusion about the best interpretation,' thereby resolving any perceived ambiguity." *Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (quoting *Kisor*, 139 S. Ct. at 2448 (Kavanaugh, J., concurring in the judgment)). With that framework as our guide, we turn first to Smukler's objection to the jury instruction on "willfully."

16

## A. "Willfully" and the Criminal Law

Interpreting the legal term "willfully" is a good example of a "hard interpretive conundrum[]." *Kisor*, 139 S. Ct. at 2415. Sometimes, and "[m]ost obviously," "[willfully] differentiates between deliberate and unwitting conduct." *Bryan*, 524 U.S. at 191. "[B]ut in the criminal law," the word "also typically refers to a culpable state of mind." *Id.* Often, that requires the Government to "prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* at 192 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)).

Often, but not always. Sometimes "a more particularized ['willfully'] showing is required." *Id.* Then, "the jury must find that the defendant was aware of the specific provision of the [statute] that he was charged with violating." *Id.* at 194 (citing *Cheek v. United States*, 498 U.S. 192, 201 (1991)). In *Bryan*, the Supreme Court explained that prosecutions "involv[ing] highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct," *id.*, justified a "carve out . . . exception to the traditional rule that ignorance of the law is no excuse," *id.* at 195 (internal quotation marks and alteration omitted). Under this narrow departure from the ordinary legal meaning of "willfully," the Government must "pro[ve] that the defendant was subjectively aware of the duty at issue, [which] would avoid . . . unfair results." *Id.* at 195 n.22 (quoting *United States v. Aversa*, 984 F.2d 493, 502 (1st Cir. 1993) (Breyer, C.J., concurring)). But the Court has limited the "need for [*mens rea*] specificity" only to certain cases involving the tax code and similarly complex laws governing financial institutions. *Id.* at 194–95 & n.22 (citing *Cheek*, 498 U.S. at 201; *Ratzlaf*, 510 U.S. at 138, 149); s*ee also Aversa*, 984 F.2d

17

at 502 (Breyer, C.J., concurring) (observing that "criminal prosecutions for 'currency law' violations . . . very much resemble criminal prosecutions for tax law violations" because "[b]oth sets of laws are technical; and both sets of laws sometimes criminalize conduct that would not strike an ordinary citizen as immoral or likely unlawful").

Smukler and the Government dispute which interpretation of "willfully" should apply here.[7] We have already answered that question and applied the heightened "willfully" standard to prosecutions under 18 U.S.C. §§ 2(b) and 1001 "in the federal election law context." *United States v. Curran*, 20 F.3d 560, 569 (3d Cir. 1994). That requires us to vacate Smukler's convictions at Counts V and VI. But we will uphold Smukler's convictions on all other counts, because FECA is best read to contain the ordinary meaning of "willfully."

### 1.    *Judicial Interpretations of "Willfully"*

Smukler's argument proceeds from a mistaken reading of caselaw, not the best reading of the statute. Recall that he

---

[7] Count XI charged Smukler with obstruction of justice, in violation of 18 U.S.C. §§ 2 and 1505, and did not require proof of willfulness. "To prove a violation of § 1505, the government must show: '(1) that there was an agency proceeding; (2) that the defendant was aware of that proceeding; and (3) that the defendant intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding.'" *United States v. Warshak*, 631 F.3d 266, 325 (6th Cir. 2010) (quoting *United States v. Bhagat*, 436 F.3d 1140, 1147 (9th Cir. 2006)). So we will uphold his conviction on this count.

asked for a jury instruction incorporating a heightened "willfully" standard requiring the Government to prove both that he knew the specific law prohibiting his actions and that he intended to violate that specific law. His support is our decision in *Curran* holding "that a proper charge for willfulness in cases brought under sections 2(b) and 1001 [of Title 18] in the federal election law context requires the prosecution to prove that [the] defendant knew of the [specific legal] obligations, that he attempted to frustrate those obligations, and that he knew his conduct was unlawful." 20 F.3d at 569. Smukler urges us to extend *Curran*'s heightened "willfully" standard to *all* charges brought under section 2(b) and FECA. But that conflicts with both our precedent and an ordinary interpretation of "willfully."

An overview of our jurisprudence cases sets the stage. *Curran* relies on the Supreme Court's opinions in *Cheek* and *Ratzlaf*, cases involving federal tax and financial laws. Both are notable for their rarity. *Cheek* held that a *mens rea* of "willfully" in the criminal tax statutes 26 U.S.C. §§ 7201 and 7203 required actual knowledge of the relevant legal duty. 498 U.S. at 202–07. The Court reasoned that the "average citizen" often struggles to comply with our nation's sprawling tax system. *Id.* at 199–200. From that assumption, the Court intuited that Congress had "softened the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses." *Id.* at 200. But the Court was quick to acknowledge the "general rule" "deeply rooted in the American legal system": "[I]gnorance of the law or a mistake of law is no defense to criminal prosecution." *Id.* at 199.

A similar conclusion arrived in *Ratzlaf*, a case involving cash structuring contrary to 31 U.S.C. §§ 5322(a) and 5324(3).

19

Concerned that these complex provisions might trip up ordinary people, the Court held that establishing "willful" violations of structuring requires the government to prove knowledge that the specific structuring behavior was unlawful. *Ratzlaf*, 510 U.S. at 141, 144–46, 149. But as in *Cheek*, the Court emphasized these circumstances represented the extraordinary instance where ignorance of the law was a defense to a criminal charge. *Id.* at 149.

We decided *Curran* shortly after *Ratzlaf*. Both cases concerned disclosure obligations imposed by regulatory laws. *Curran*, 20 F.3d at 569. And both involved prosecution under statutes with a *mens rea* of "willfully." *See id.* at 568. Given these similarities, we applied the *Cheek-Ratzlaf* standard to tandem charges brought under 18 U.S.C. §§ 2(b) and 1001 in the elections context. *Id.* at 569. But more recent decisions from the Supreme Court, and ours, clarify that *Cheek* and *Ratzlaf* do not sweep further. Rather, they remain the exceptions that prove the rule.

Take *Bates v. United States*, where the Supreme Court considered the meaning of 20 U.S.C. § 1097(a), which makes it a felony to "knowingly and willfully" misapply student loan funds insured under Title IV of the Higher Education Act of 1965. There, the petitioner urged the Court to find, as in *Ratzlaf*, that the actual intent to defraud was an essential, although unexpressed, element of the offense. *Bates v. United States*, 522 U.S. 23, 30 (1997). But the Court rejected any comparison: "*Ratzlaf*," it wrote, turned on the "particular statutory context" of complex currency structuring transactions. *Id.* at 31 n.6.

The Supreme Court was even clearer a year later in *Bryan* construing the prohibition on interstate transfers of

firearms in 18 U.S.C. § 922(a)(1)(A). The petitioner argued that the *Cheek-Ratzlaf* standard required the government prove he knew about the federal licensing regime. *Bryan*, 524 U.S. at 189–90. But the Court distinguished *Ratzlaf* and *Cheek* as matters "involv[ing] highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct." *Id.* at 194. "[W]illfulness," the Court admonished, does not "carve out an exception to the traditional rule that ignorance of the law is no excuse." *Id.* at 196. And it reaffirmed that logic in *Safeco Ins. Co. of Am. v. Burr*, characterizing readings of willfulness that require "specific intent to violate a known legal duty" as, again, applying to "highly technical statutes." 551 U.S. 47, 57 n.9 (2007) (citing *Cheek*, 498 U.S. at 200–01).

We have followed the same path. In *Starnes*, guided by *Bryan*, we observed that "willfully" has "at least three levels of interpretation." *Starnes*, 583 F.3d at 210. In some contexts, "willfully" may indicate "an act which is intentional, or knowing, or voluntary, as distinguished from accidental." *Id.* (internal quotation marks omitted). In others, particularly in the criminal context, it may require the government to prove that the defendant acted "not merely voluntarily, but with a bad purpose, that is, with knowledge that his conduct was, in some general sense, unlawful." *Id.* (internal quotation marks omitted). And finally, "in some *rare* instances," we observed that "'willfully' has been read to require proof that the defendant actually knew of the specific law prohibiting the conduct." *Id.* at 211 (emphasis added). But like *Bryan*, we pointed out that these unusual cases involve only "highly technical statutes" and, in *Curran*, the unusual instance of a tandem election prosecution brought under 18 U.S.C. §§ 2(b) and 1001. *Id.*; *accord United States v. Stadtmauer*, 620 F.3d

21

238, 256 (3d Cir. 2010) ("The justification for requiring knowledge of the relevant tax laws is that, 'in our complex tax system, uncertainty often arises even among taxpayers who earnestly wish to follow the law, and it is not the purpose of the law to penalize frank difference[s] of opinion or innocent errors made despite the exercise of reasonable care.'" (alteration in original) (quoting *Cheek*, 498 U.S. at 205)).

Smukler reaches for the rarest meaning, pushing to extend the extraordinary *Cheek-Ratzlaf* "willfully" standard not just to the charges brought under 18 U.S.C. §§ 2(b) and 1001, but to his substantive FECA charges as well. *Curran*, he maintains, requires as much. It does not. As the Supreme Court and we have repeatedly explained, the *Cheek-Ratzlaf* interpretation applies to "complex[]," *Cheek*, 498 U.S. at 200, or "highly technical," *Bryan*, 524 U.S. at 194, statutes. And Smukler does not specify *what* about FECA he finds to be "complex" or "highly technical." He protests its length in a footnote. (*See* Reply Br. at 4 n.5.) True enough, as FECA packs in rules for contributions (and a host of other conduct) that candidates, campaigns, and contributors must follow when engaging in election politicking. But those rules are reasonably straightforward and written in common terms. One provision sets forth the contribution limits applicable to every congressional candidate in each election cycle. 52 U.S.C. § 30116. Another makes it unlawful for individuals to contribute in the names of others. *Id.* § 30122. A third requires honestly reporting contributions received to the FEC. *Id.* § 30104. Civil and criminal penalties can result from a "knowing[] and willful[]" violation of FECA. *Id.* § 30109(d). But "compared with anti-structuring or tax laws, as in *Ratzlaf* or *Cheek*, individual campaign contribution laws are more intuitive and less complex." *United States v. Danielczyk*, 788

F. Supp. 2d 472, 490 (E.D. Va. 2011), *reversed in part on other grounds*, 683 F.3d 611 (4th Cir. 2012). All of which speaks to an ordinary, not extraordinary, set of prohibitions. Consistent with precedent, we likewise apply the ordinary reading of "willfully" to FECA.

### 2.    *Applying Familiar Principles of Interpretation*

Smukler next suggests that the *Cheek-Ratzlaf* heightened "willfully" standard is warranted since his FECA offenses follow the "aiding and abetting" prohibitions of 18 U.S.C. § 2(b).[8] Section 2(b) of Title 18 makes it a crime for a person to "willfully cause[] an act to be done which if directly performed by him . . . would be an offense against the United States." The statute "imposes liability on a defendant who does not himself commit the prohibited *actus reus*, but intentionally manipulates an innocent intermediary to commit the prohibited *actus reus*." *United States v. Gumbs*, 283 F.3d 128, 134 (3d Cir. 2002). As we explained, *Curran* held that the *mens rea* element required under § 2(b) for causing a false statement in violation of 18 U.S.C. § 1001 goes beyond the *mens rea* required by § 1001 and applied the *Cheek-Ratzlaf* reading of

---

[8] The substantive FECA charges alleged in Counts II, VII, VIII, IX, and X all require proof that Smukler acted "willfully." He was also charged with "willfully caus[ing]" the violations. The Government acknowledges that Smukler did not personally transmit false statements to the FEC, so Counts V, VI, and X require proof that he "willfully cause[d]" those acts under 18 U.S.C. § 2(b).

23

"willfully."[9] *See* 20 F.3d at 567–69. Smukler seems to contend we must do the same for his FECA offenses charged under § 2(b), even if the "willfully" *mens rea* in his substantive FECA

---

[9] We have divorced 18 U.S.C. § 1001 from the *Cheek-Ratzlaf* heightened willfully requirement when not paired with § 2(b). In *Starnes*, we applied 18 U.S.C. § 1001(a)'s false statements statute to a regulatory scheme that subjected the defendants to criminal liability under the Clean Air Act. There, we noted that *Curran*, relying on *Ratzlaf*, "held that the strictest interpretation of criminal willfulness governed tandem violations of §§ 1001 and 2(b) in the 'federal election law context.'" *Starnes*, 583 F.3d at 211. But since that case involved neither § 2(b) nor election law, *Curran*'s heightened standard did not apply. Instead, we held that § 1001's "knowingly and willfully" requirement meant that the government must only show that "a defendant acted deliberately and with knowledge that the representation was false." *Id.* (quoting *Curran*, 20 F.3d at 567). That result, we wrote, "comports with the generally understood meaning of 'knowingly' and with the intermediate level of interpretation of 'willfully' articulated by the Supreme Court in *Bryan*—that is, knowledge of the general unlawfulness of the conduct at issue—which we believe adequately demarcates the boundary between innocent and unlawful conduct in this context." *Id.* at 211–12 (citing *Bryan*, 524 U.S. at 195 & n. 23). And we rejected the suggestion that a *mens rea* of "knowingly and willfully" required "the government . . . to prove that [the defendant] actually knew of [the law allegedly violated]." *Id.* at 212. So too here. *See, e.g.*, 52 U.S.C. § 30109(d)(1)(A) (FECA penalty provision with *mens rea* of "knowingly and willfully").

charges would not be so read. (It will not, as we already explained.)

We have declined that approach in other prosecutions under 18 U.S.C. § 2(b). For example, in *Gumbs*, we considered a tandem prosecution brought under 18 U.S.C. §§ 2(b) and 287. There, we clarified *Curran*, explaining that "in a prosecution under [18 U.S.C.] § 2(b), the government must show the following *mens rea* elements: (1) that the defendant had the *mens rea* required by the underlying statute; and (2) that the defendant willfully caused the innocent intermediary to commit the act prohibited by the underlying statute." *Gumbs*, 283 F.3d at 135. In other words, § 2(b) does not automatically alter the "most natural interpretation" of "willfully." *United States v. Gabriel*, 125 F.3d 89, 101 (2d Cir. 1997) ("The most natural interpretation of section 2(b) is that a defendant with the mental state necessary to violate the underlying section is guilty of violating that section if he intentionally causes another to commit the requisite act." (emphasis omitted)); *see also United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999) ("The natural reading of §§ 2(b) and 1001 is this: the government may show mens rea simply by proof (1) that the defendant knew that the statements to be made were false (the mens rea for the underlying offense—§ 1001) and (2) that the defendant intentionally caused such statements to be made by another (the additional mens rea for § 2(b))").

Under Smukler's approach, we would apply the *Cheek-Ratzlaf* heightened standard of "willfully" to FECA offenses when paired with an aiding and abetting charge. No matter, he says, that this would require us to apply different meanings to the same word in the same statute. But our interpretive kit includes no such tool. Rather, it is a fundamental interpretive norm that "[a] term appearing in several places in a statutory

25

text is generally read the same way each time it appears." *Ratzlaf*, 510 U.S. at 143.[10] "[W]hether section 2(b) require[s] a knowing violation of the law" cannot "turn on the context in which the statement was made." *Gabriel*, 125 F.3d at 101. "Moreover, if a defendant was prosecuted under section 2(b) and a criminal section other than section 1001," as here, "whether section 2(b) required a knowing violation of the law would turn not only on the nature of the other section but also on the context of the alleged violation of that section." *Id.* As the Second Circuit hypothesized, "[a]side from the obvious interpretative difficulties that this approach would take," giving "willfully" a malleable interpretation under § 2(b) would make it dependent on the context of the underlying statute. *Id.* So "however 'willfully' is to be interpreted under section 2(b), it should be interpreted consistently." *Id.*

We agree. As a result, we decline Smukler's invitation to "open Pandora's jar," by "reading ['willfully'] differently for each code section to which it applies." *Ratzlaf*, 510 U.S. at 143. The District Court's instructions to the jury were therefore proper.

---

[10] We note that while *Curran* tethers its approach to *Ratzlaf*, other courts have disagreed. *See Hsia*, 176 F.3d at 522 (noting that *Curran* "extends *Ratzlaf* too far"); *see also Gabriel*, 125 F.3d at 101 (concluding *Curran* "focused its attention almost exclusively on the federal election laws and explicitly limited its decision to 'cases brought under sections 2(b) and 1001 in the federal election law context'—indicating that in other contexts, the court might interpret section 2(b)'s 'willfully' requirement differently" (quoting *Curran*, 20 F.3d at 569)).

**B.    Smukler's Convictions at Counts V and VI Contravene *Curran***

Counts V and VI charged Smukler with violating 18 U.S.C. §§ 2 and 1001(a)(1) by causing the false statements of others within the Brady and Margolies campaigns. On these counts, the District Court's instruction on "willfully" missed the mark established by *Curran*. As we explained, under *Curran*, "a proper charge for willfulness in cases brought under [18 U.S.C. §§] 2(b) and 1001 in the federal election law context requires the prosecution to prove that defendant knew of the [statutory] obligations, that he attempted to frustrate those obligations, and that he knew his conduct was unlawful." 20 F.3d at 569; *see also Starnes*, 583 F.3d at 211 (noting *Curran* "held that the strictest interpretation of criminal willfulness governed tandem violations of §§ 1001 and 2(b) in the federal election law context" (internal quotation marks omitted)).

Counts V and VI charged Smukler with such "tandem" violations of §§ 1001 and 2(b). The supporting allegations center on Smukler's actions during the Brady and Margolies campaigns, so they occurred "in the federal election law context." *Curran*, 20 F.3d at 569. While *Curran*'s "federal election law context" modification is too broad in other scenarios, it does apply to these counts.

The Government brings two arguments in rebuttal, but neither prevails. First, that *Bryan* abrogated *Curran*. It did not, as the Supreme Court limited its holding. *See Bryan*, 524 U.S. at 199–200 ("[O]ur grant of certiorari was limited to the narrow legal question whether knowledge of the licensing requirement [of 18 U.S.C. § 924(a)(1)(D)] is an essential element of the offense."). So we must follow the narrow holding in *Curran*.

27

Second, even if the District Court erred, any error was harmless. Not so. For error to be harmless, we must "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 19 (1999). "When the error involves a *mens rea* instruction, '[a] verdict may still stand, despite erroneous jury instructions, where the predicate facts conclusively establish [*mens rea*], so that no rational jury could find that the defendant committed the relevant criminal act' without also finding the requisite *mens rea*." *United States v. Elonis*, 841 F.3d 589, 598 (3d Cir. 2016) (alterations in original) (quoting *Whitney v. Horn*, 280 F.3d 240, 260 (3d Cir. 2002)).

Based on our holding in *Curran*, the District Court's instructions did not provide the proper guidance. The jury needed to consider Smukler's culpability based on the *heightened* "willfully" standard—that Smukler knew the legal duty of the particular laws charged. After reviewing the record, we cannot conclude that "no reasonable jury could find that th[is] element was not present." *United States v. Andrews*, 681 F.3d 509, 527 (3d Cir. 2012). So we will vacate Smukler's conviction on these counts.

## IV. SMUKLER'S OTHER CHALLENGES LACK MERIT

Smukler brings three remaining challenges to his convictions. First, he argues that the District Court erred by not finding a portion of Count II outside the statute of limitations. Second, he attacks the sufficiency of the evidence produced on Count V. Finally, he sees error in the District Court's failure to give specific unanimity charges to the jury on Counts V and X. As to these challenges, we find no error and will affirm.

**A.    The District Court Did Not Err in Rejecting Smukler's Motion to Dismiss Count II**

Count II of the superseding indictment charged Smukler with violating 52 U.S.C. §§ 30109(d)(1)(A)(i) and 30116, by knowingly and willfully causing the Brady campaign to make contributions to the Moore campaign in excess of the limits of FECA, at an aggregated amount of $25,000 or more.[11] Recall the basis: the three payments Smukler steered from the Brady campaign to the Moore campaign. The first, a June 11, 2012 payment of $40,000 routed through VDS, a Smukler-owned consulting company. The second, a July 10, 2012 payment of $25,000 sent through VDS. And the third, an August 23, 2012 payment of $25,000 from Smukler's associate Jones to Cavaness. Smukler argues two of the three contributions fell outside the statute of limitations. We disagree.

Since the last of the three payments occurred on August 23, 2012 and the grand jury did not indict Smukler until October 24, 2017, the indictment would ordinarily be outside FECA's five-year statute of limitations. *See* 52 U.S.C. § 30145. But before the statute of limitations ran on the August

---

[11] FECA makes it a crime to "knowingly and willfully commit[] a violation" that "involves the making . . . of any contribution . . . aggregating $25,000 or more during a calendar year." 52 U.S.C. § 30109(d)(1)(A)(i). Section 30116 sets the limit on contributions to a political campaign at $2,000 per election, adjusted for inflation. For the 2012 election cycle, the contribution limit was $2,500 per election.

2012 payment, Smukler signed a tolling agreement.[12] The agreement, executed on August 21, 2017 and extended on September 25, 2017, moved the deadline for charges out to October 26, 2017. The first indictment was returned before the expiration of the extended tolling agreement and, citing *Dees*, the District Court found all three payments within the statute of limitations. We agree with that analysis.

In *Dees*, the defendant was charged with violating 18 U.S.C. § 1029(a)(2), making it a crime to use "unauthorized access devices"—there credit cards—to "obtain[] anything of value aggregating $1,000 or more" during "any one-year

---

[12] The August tolling agreement states that Smukler agrees to toll any applicable statute of limitations about:

> charges arising out of a payment from the Bob Brady for Congress campaign committee on or about August 23, 2012 to D. Jones & Associates in the amount of $25,000 and the subsequent use of that money by D. Jones & Associates[,] from August 23, 2017 to September 26, 2017.

(App. at 133.)

In paragraph six of the agreement, Smukler acknowledges that he "understand[s] that by agreeing to toll, and thus not to assert, the claim of statute of limitations, [he is] giving up any rights [he] may have under the federal statute of limitations provisions regarding charges that may result from the investigation described in this document for which the limitations period expires on or about August 23, 2017." (App. at 134.)

30

period." 215 F.3d at 379 (quoting 18 U.S.C. § 1029(a)(2)). Dees used credit cards to make three fraudulent purchases, only one of which occurred within the limitations period. *Id.* We held that because the third purchase fell within five years of the indictment, "the offense as actually charged was completed on . . . the date of the last purchase" and so "the statute of limitations started running at that time." *Id*. at 380. "[I]nasmuch as the offense is defined as activity 'during any one-year period,'" we explained, "the offense is complete as to any one-year period when there is or are unauthorized uses of access devices, and the aggregated value of things obtained through the use of those access devices within the one-year period ending on its last day equaled or exceeded $1,000." *Id.*

The enforcement provision of FECA, 52 U.S.C. § 30109, is worded similarly to the statute considered in *Dees*, and likewise provides for aggregation during a one-year period.[13] For that reason, the District Court held that "*Dees*

---

[13] *Compare* 52 U.S.C. § 30109(d)(1)(A)(i) ("Any person who knowingly and willfully commits a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure . . . aggregating $25,000 or more during a calendar year shall be fined under Title 18, or imprisoned for not more than 5 years, or both[.]") *with* 18 U.S.C. § 1029(a)(2) ("Whoever . . . knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period . . . shall, if the offense affects interstate or foreign commerce, be punished . . . .").

governs this case and that 'inasmuch as the offense is defined as activity during any one-year period the offense is complete as to any one-year period' on the date of the last contribution identified in the calendar year 2012." (App. at 25 (quoting *Dees*, 215 F.3d at 380).) So "[t]he Government properly charged that defendant and his co-conspirators caused payments aggregating at least $25,000 in a calendar year, between June 2012 and August 2012." (App. at 25.)

Smukler disagrees and argues that he only agreed to toll the August 2012 payment, not the two earlier ones. In other words, he "did not agree to toll the statute as to any charges 'arising out of' the totality of payments in the same calendar year in which the August 2012 payment was made." (Opening Br. at 32.) Since each of the three payments would have independently sufficed to support a felony charge under FECA as each totaled $25,000 or more, the earlier payments would not "hav[e] [their] origins in, the third payment." (Opening Br. at 32.) This interpretation, he contends, is "the better plain-language understanding of the agreement." (Opening Br. at 33.)

We begin with the self-evident: "the language of a contract . . . matters greatly." *United States v. Goodson*, 544 F.3d 529, 535 (3d Cir. 2008). Yet Smukler advocates for an unnaturally narrow reading of his agreement. First, "arising out of" is a broad provision. *See Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 804 (10th Cir. 1998) (noting "the general consensus that the phrase 'arising out of' should be given a broad reading such as 'originating from' or 'growing out of' or 'flowing from' or 'done in connection with'") (citing cases); *see also In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 523 (3d Cir. 2019) (explaining "arising out of . . . in a contract" is "indicative of an extremely broad agreement"

32

(cleaned up)); *In re Prudential Ins. Co. of Am. Sales Practice Litig. All Agent Actions*, 133 F.3d 225, 232 (3d Cir. 1998) (use of "arising out of" shows broad drafting). Second, the agreement put Smukler on fair notice of possible charges under 52 U.S.C. § 30109, which includes an aggregating provision during a calendar year for campaign contribution violations. Third, Smukler elsewhere agreed that "[n]othing . . . limit[s] the ability of the United States to bring criminal charges prior to the expiration of th[e] tolling agreement," and that he waived all rights under the applicable statute of limitations "regarding charges that may result from the investigation described in th[e] document." (App. at 138.)

Smukler tries to distinguish *Dees*, asserting that because each of the three payments was for "$25,000 or more," each independently sufficed to support a felony charge on the Government's theory under 52 U.S.C. § 30109(d)(1)(A). While true, nothing in the statute suggests that the Government *had* to indict Smukler on separate charges. Reading the statute in that way would render "aggregating" surplusage. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("If possible, every word . . . is to be given effect[.]"). And no normal reading of the statute would permit aggregation if one of the payments had been only $24,999, but not when all were for $25,000 or more.

For these reasons, while the agreement only references the August 23, 2012 payment, the potential charges emanating from that payment are not similarly limited. Whether Smukler assumed a narrower reading is not relevant, as our role is to "focus not on intent, but on words." *United States v. Damon*, 933 F.3d 269, 273 (3d Cir. 2019). We will therefore affirm this count of conviction.

33

**B.    Sufficient Evidence Supports Smukler's Conviction at Count V**

Smukler also contends that there was insufficient evidence to support his conviction under Count V for causing the Brady and Moore campaigns to make false reports and fail to report to the FEC, in violation of 18 U.S.C. §§ 1001(a)(1) and 2(b). Although we are vacating Smukler's conviction at Count V because of the faulty jury instruction on "willfully," "[Smukler] can only be retried on th[is] count[] if the Government introduced sufficient evidence to sustain th[e] conviction." *United States v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Serafini*, 233 F.3d 758, 770 (3d Cir. 2000). We must affirm the jury's verdict where "there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict." *United States v. Lee*, 612 F.3d 170, 178 (3d Cir. 2010) (citation omitted). That is the case here.

Smukler constructed a scheme that paid Moore $90,000 to drop out of the 2012 Democratic primary in Pennsylvania's First Congressional District. He used "dummy invoices" to disguise the money, routing multiple payments through his company VDS. (App. at 954, 1063.) False filings with the FEC covered up the tracks. A rational jury could have found beyond a reasonable doubt that Smukler caused the false filings and that his actions are only explainable as deliberate efforts to evade the campaign finance laws at issue.

## C. The Jury Instructions at Count X Were Not Plainly Erroneous

Smukler finally claims that the lack of a specific unanimity instruction on the false statement charges in Counts V and X violated his Sixth Amendment right to a unanimous verdict. The parties agree we review for plain error because Smukler failed to raise this issue at trial. Under Federal Rule of Criminal Procedure 52(b) "we must decide whether (1) an error occurred, (2) the error is 'plain,' and (3) it 'affect[s] substantial rights.'" *United States v. Payano*, 930 F.3d 186, 192 (3d Cir. 2019) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993) (alteration in original)). Meeting all three conditions allows a court discretion to correct a "particularly egregious" error, *United States v. Frady*, 456 U.S. 152, 163 (1982), if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," *Olano*, 507 U.S. at 736 (alteration in original) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). Because we have already determined that Smukler's conviction at Count V must be vacated, we will only review Count X.

Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Const. amend. VI. It is "unmistakable" that the Framers and Ratifiers of our Constitution understood "trial by an impartial jury" to mean that "[a] jury must reach a unanimous verdict in order to convict." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020) (explaining that juror unanimity stretches back to 14th century England, where it was "accepted as a vital right protected by

35

the common law"); *see also United States v. Yeaman*, 194 F.3d 442, 453 (3d Cir. 1999) ("It is well settled that a defendant in a federal criminal trial has a constitutional right to a unanimous verdict.").

The right to a unanimous verdict "includes the right to have the jury instructed that in order to convict, it must reach unanimous agreement on each element of the offense charged." *Gonzalez*, 905 F.3d at 183 (quoting *Yeaman*, 194 F.3d at 453). Such an instruction is known as the "general unanimity instruction." *United States v. Beros*, 833 F.2d 455, 460 (3d Cir. 1987). "Typically, when an indictment alleges a number of different factual bases for the defendants' criminal liability, the general unanimity instruction ensures that the jury unanimously agrees on the factual basis for a conviction." *Gonzalez*, 905 F.2d at 183. But when "a statute enumerates alternative routes for its violation, it may be less clear . . . whether these are mere means of committing a single offense (for which unanimity is not required) or whether these are independent elements of the crime (for which unanimity is required)." *Id.* (alteration in original) (quoting *Yeaman*, 94 F.3d at 453). And so, in some cases, a "general unanimity instruction" is not sufficient, and "a more specific unanimity instruction" is necessary. *Id.* (citing *Beros*, 833 F.2d at 460).

But "a specific unanimity instruction is the exception to the 'routine case,'" *United States v. Cusumano*, 943 F.2d 305, 312 (3d Cir. 1991), only applicable when "complexity . . . or other factors, creates the potential that the jury will be confused," *Beros*, 833 F.3d at 460. In most, "even where an indictment alleges numerous factual bases for criminal liability," "a 'general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction.'"

36

*Gonzalez*, 905 F.3d at 184 (quoting *Cusumano*, 943 F.2d at 312).

Count X charged Smukler with:

> [W]illfully caus[ing] the authorized campaign committee of a candidate for the United States House of Representatives to falsely report to the FEC contributions received by that committee over $200, to wit causing Candidate C 2014 to report to the FEC payments from Black and Blue and InfoVoter as refunds when in fact those payments were unlawful contributions routed through those companies aggregating $25,000 and more in calendar year 2014, and causing Candidate C 2014 to report contributions from SMUKLER in the names of others.[14]

(App. at 123.)

Because Smukler did not request a specific unanimity instruction, the Court charged the jury on general unanimity:

> I want to remind you that your verdict, whether it is guilty or not guilty, must be unanimous. To find the defendant guilty of an offense, every one of you must agree that the Government has overcome the presumption of innocence with evidence that proves each element of that offense beyond a reasonable doubt. To find the

---

[14] In violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), 30109(d)(1)(A)(i), and 18 U.S.C. § 2.

defendant not guilty, every one of you must agree that the Government has failed to convince you beyond a reasonable doubt.

(App. at 1954:9–16.)

This is not error, let alone plain error, as Smukler again asks us to apply an extraordinary standard to an unextraordinary case. As we explained, neither FECA, nor the facts offered by the Government, are so complex as to risk jury confusion. It is also not plain that the charge depended, as Smukler contends, on "a composite theory of guilt." *Beros*, 833 F.2d at 462. This theory, which we explained in *Beros*, "applies where the Government advances different factual theories concerning the defendant['s] charged conduct, each of which could independently satisfy the elements of the crime." *Gonzalez*, 905 F.3d at 184. In *Beros*, the government proceeded with a sixteen-count indictment, with two of the counts "alleg[ing] four separate and distinct theories of criminal activity" and "enumerat[ing] several acts upon which a finding of guilt could be predicated." 833 F.2d at 461. Concerned by the disjunctive nature of the charging statutes and the multiple, factually distinct allegations of criminal conduct, we could "easily imagine" juror disagreement. *Id.* For example, four of the jurors might have focused on Beros's improper use of a credit card, another four on his unapproved hotel upgrades, and the final four on his turning a business trip into a personal vacation. *See id.* at 461–62. So, we held that "[w]hen the government chooses to prosecute under an indictment advancing multiple theories, it must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury." *Id.* at 462.

38

Here, however, the Government advances only a single theory of liability. Count X charges Smukler with multiple FECA offenses, but at least arguably under a single factual basis: that Smukler caused the Margolies campaign to make false reports to the FEC. Those falsities violated FECA's prohibition against (1) improperly reporting that the "refunds" from Black and Blue Media and InfoVoter were, in fact, lawful contributions; and (2) improperly reporting contributions from individuals which were, in fact, contributions made by Smukler.

And even assuming this satisfies *Olano*'s first and second prongs—that there was an error, and the error was plain—Smukler cannot show that the error "affected the outcome of the district court proceedings." *Payano*, 930 F.3d at 192 (alteration in original) (quoting *Olano*, 507 U.S. at 734). At Counts VII and VIII the jury found Smukler guilty of violating the underlying FECA provisions that Count X charged him with causing the Margolies campaign to falsely report. There is overwhelming evidence in the record that Smukler duped the campaign into assuming the legitimacy of these contributions. The mere fact that the jury found that Smukler concealed the true nature of these contributions in Counts VII and VIII is likely enough to satisfy Count X's charge.[15] While Smukler bears the burden on appeal, he

---

[15] For instance, recall that Jones testified that his contribution to the Margolies campaign depended on Smukler reimbursing him, which Smukler did by sending Jones a check from InfoVoter. And Smukler, as head of the campaign, instructed Margolies' campaign treasurer that the contributions made from Black and Blue Media and InfoVoter were, in fact, "refunds."

provides no showing for how a specific unanimity charge would "have affected the outcome of the district court proceedings." *Payano*, 930 F.3d at 192 (quoting *Olano*, 507 U.S. at 734). In short, Smukler has far from satisfied the exacting standard of plain error review.

## V. CONCLUSION

For these reasons, we will vacate and remand the judgment of conviction at Counts V and VI, and we will affirm all other counts of Smukler's conviction.